**Opinion filed September 22, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00079-CV

_____

## IN THE INTEREST OF L.M., A CHILD

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 10343-CX**

## M E M O R A N D U M   O P I N I O N

This is an appeal from an order in which the trial court terminated the parental rights of the mother and the father to one of their children, L.M. Both parents appeal. The mother (in three issues) and the father (in four issues) challenge the sufficiency of the evidence to support the termination of their parental rights. We affirm the trial court's order.

### *Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001(b), 161.206(a), (a-1) (West 2022). To terminate one's parental rights under Section 161.001, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in

Section 161.001(b)(1)(A)–(U) and that termination is in the best interest of the child. *Id.* In this case, the trial court found that the mother had committed one of the acts listed in Section 161.001(b)(1)—that found in subsection (E)—and that the father had committed two of the acts—those found in subsections (D) and (E). Specifically, the trial court found that both parents had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. *See id.* § 161.001(b)(1)(E). The additional finding with respect to the father was that he had knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. *See id.* § 161.001(b)(1)(D).

In addition to the findings under Section 161.001(b)(1), the trial court also found, pursuant to Section 161.003, that both parents have a mental or emotional illness or a mental deficiency that renders them unable to provide for the physical, emotional, and mental needs of the child; that each parent's illness or deficiency will, in all reasonable probability, continue until the child's eighteenth birthday; that the Department of Family and Protective Services has been the managing conservator of the child for the six months preceding the termination hearing; and that the Department made reasonable efforts to return the child to the parents. *See id.* § 161.003(a)(1)–(4).

The trial court also found that termination of each parent's parental rights would be in the best interest of the child. *See id.* §§ 161.001(b)(2), 161.003(a)(5).

To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or

conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We note that the trial court is the sole arbiter of the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

*Procedural and Factual Background*

The intake in this case related to R.M., but the Department quickly became concerned about the welfare of both R.M. and L.M. Both children remained in the case when the trial began. However, because of an issue regarding the failure to serve R.M.'s presumed father, the trial court declared a mistrial with respect to R.M., severed R.M.'s portion of the case into another cause, and continued the trial as to L.M. The termination order from which the parents appeal relates only to one child: L.M.; thus, the only child at issue in this appeal is L.M. Furthermore, we refer to

L.M.'s father as "the father" in this opinion even though he is not R.M.'s biological, presumed, or alleged father.

The record shows that R.M. and L.M. were both hospitalized at the time of the intake that precipitated this case. Eleven-month-old R.M. had a fractured arm, and newborn L.M. was in the NICU. After initially claiming that R.M. hurt her arm when she fell backwards on a mattress, both the mother and the father eventually admitted that the father caused the injury to R.M.'s arm. The father told police that he forcibly put R.M.'s arm behind her back, "like, put it in a chicken wing -- causing the break to her arm." The reason given by the parents was that the father was frustrated because R.M. was crying. The father stated that he did not intend to hurt R.M. But the mother informed the Department's investigator that the father hurts R.M. when the mother leaves R.M. alone with him. A babysitter also expressed concerns that the father had used "physical discipline" on R.M.

In addition to her broken arm, R.M. showed signs of neglect. R.M. was underweight and was already five months behind developmentally. When R.M. was removed from the parents' care, she was not even rolling over yet; however, within a few months of being placed in the care of her foster parents, R.M. got back on schedule.

According to nurses at the hospital, R.M. was underfed. The nurses at the hospital had to remind the parents to feed R.M. The parents, however, only fed R.M. two ounces of formula at each feeding. This amount of formula would have been appropriate for a newborn, but it was not sufficient for R.M. The foster parents had similar concerns. Additionally, when the Department's investigator visited the parents' home during the intake process, the parents had no baby food in their home even though R.M. should have been eating baby food by that stage in her life. The nurses purchased some baby food for R.M.

The Department's investigator testified that the mother seemed "lost" with respect to how to properly care for her children and what the "next step" was. The mother was overwhelmed, anxious, and sometimes confused. She failed to comprehend why it would not be a safe alternative for her and the children to move in with her grandmother even though the grandfather—that had sexually abused the mother when she was a child—still lived with the grandmother. The mother insisted that she wanted to stay in a relationship with the father even though the father constituted a risk of danger to the children. The mother also had a history of remaining in abusive relationships.

The parents' actions, and inactions, are likely explained by their intellectual disabilities. Both parents had been clients of the Betty Hardwick Center for years. Psychological testing of the mother revealed that she has a mild intellectual disability and an autism spectrum disorder. The mother's IQ in 2017, which was measured while the mother was "in a crisis situation," was only 36. Her adaptive assessment score was 65 in 2017, but by 2021, that score had risen to 87.

Psychological testing of the father revealed that he has a mild intellectual disability. During the years that the parents were receiving services at the Betty Hardwick Center, both parents' diagnoses went from "moderate" to "mild" intellectual disability. However, neither parent's diagnosis was expected to change in the future. The Betty Hardwick employee who testified at trial indicated that she was certified by the Health and Human Services Commission to make determinations of intellectual disability for state services but that she was not a licensed psychologist, had never seen either parent with a child, and had no knowledge of their parenting abilities.

Other witnesses, however, testified about the impact that the parents' intellectual functioning had on their ability to parent. The Department's investigator testified that the mother was unable to comprehend simple information and operated

5

at an extremely low level of functioning. The visitation supervisor testified that she was concerned that the mother would not be able to meet the basic needs of the children because she struggles to meet her own. The mother lacked an understanding of the growth and developmental needs of children. The father was easily frustrated at visits. Although the visitation supervisor testified that the children were bonded to the mother and happy to see her and that their interactions improved over time, the visitation supervisor did not believe that the parents, either together or separately, were able to care for R.M. and L.M., let alone another baby.[1] The permanency case manager echoed these sentiments and testified that the Department does not believe the mother and the father can adequately care for or provide a safe environment for R.M. and L.M. The Department believed that the mother's and the father's limitations in this regard were "likely to continue throughout the life of these children."

The parents completed the services required of them by their family service plan, and they were trying to do what they needed to do to have R.M. and L.M. returned to their care. The mother and the father had made progress in some areas. Nonetheless, the Department did not believe that the father could control himself if left alone with a child or that the mother was capable of raising a child in a safe and healthy environment. With regard to these parents and the effect that the completion of services had on their parenting, we note that the intake in the present case occurred not long after the parents had completed family based safety services as a result of a previous intake involving R.M.

After R.M. and L.M. were removed from the parents' care, they were placed in foster care and have thrived in the care of their foster parents. R.M. was healthy

---

[1]We note that the mother was pregnant at the time of this testimony and that she delivered a baby boy sometime between the first day of trial and the last day of trial. The testimony showed that this baby was released from the hospital in the care of the parents—with whom the father's stepfather was living in order to help them care for their children.

and happy, and she "gained a ton of weight." L.M. was doing well but, because of his premature birth, was still a little behind developmentally. However, the foster parents were working with L.M. to get him crawling and on track. The permanency case manager testified that both children were "very, very closely bonded" with their foster parents and that the foster parents provide a safe and appropriate home for L.M.

The Department's goal for L.M. was for the mother's and the father's parental rights to be terminated and for L.M. to be adopted by his foster parents. The foster parents wished to adopt L.M., R.M., and their older half-sister (who had lived with these same foster parents for four years). The permanency case manager for 2INgage believed that the Department's goal for L.M. was in L.M.'s best interest. She testified that the foster parents had maintained a relationship with the mother and the father during the placement of the older half-sister and had continued to encourage a relationship between that child and the parents. The foster parents indicated that they would do the same for L.M.

*Analysis*

*Endangering Conduct*

In the mother's first issue and the father's second issue, they challenge the findings made by the trial court under Section 161.001(b)(1)(E). We must address a parent's challenge to a trial court's findings under subsection (D) or (E). *See In re N.G.*, 577 S.W.3d 230, 234–35 (Tex. 2019) (addressing due process and due course of law with respect to appellate review of grounds (D) and (E) and holding that an appellate court must provide a detailed analysis if affirming the termination on either of these grounds).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.O.*, 338 S.W.3d 29, 34 (Tex.

App.—Eastland 2011, no pet.). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). The offending conduct need not be directed at the child, nor does the child actually have to suffer an injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). With respect to the sufficiency of the evidence to support a finding under subsection (E), "endangering conduct is not limited to actions directed towards the child." *Id.* (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The endangering conduct may include the parent's actions before the child's birth and may relate to the parent's actions while the parent had custody of other children. *Id.*; *In re S.T.*, No. 11-19-00363-CV, 2020 WL 2610393, at *3–4 (Tex. App.—Eastland May 18, 2020, pet. denied) (mem. op.) (upholding finding under subsection (E) based upon parent's conduct with other children). Additionally, domestic violence may constitute evidence of endangerment. *C.J.O.*, 325 S.W.3d at 265.

The record shows that the father fractured the arm of R.M., an eleven-month-old child in his care, and that the mother was aware that the father hurt R.M. when the father was left alone with the child—yet she left the father alone with R.M. anyway. The record also shows that R.M., while in the care of the mother and the father, was underfed and failed to thrive. Based upon the evidence presented at trial regarding the parents' conduct that was directed at R.M., the trial court could have reasonably found by clear and convincing evidence that the mother and the father had engaged in a course of conduct that endangered L.M.—even though L.M. had not ever been in the care of the parents after his birth. *See J.O.A.*, 283 S.W.3d at 345. Therefore, we hold that the evidence is legally and factually sufficient to uphold the trial court's finding as to both parents under subsection (E). Accordingly, we

8

overrule the mother's first issue and the father's second issue. Because only one statutory ground is necessary to support termination and because we have upheld the trial court's finding as to subsection (E), we need not address the mother's second issue or the father's first and third issues. *See* FAM. § 161.001(b)(1); *N.G.*, 577 S.W.3d at 234–35; *see also* TEX. R. APP. P. 47.1.

*Best Interest*

In the mother's third issue and the father's fourth issue, they challenge the sufficiency of the evidence to support the trial court's findings that termination of their parental rights would be in the best interest of L.M.

With respect to L.M.'s best interest, the evidence set forth above shows that, despite the Department's and Betty Hardwick's previous efforts to assist the mother and the father to appropriately parent a child, their intellectual disabilities interfered with their ability to do so. The father physically harmed eleven-month-old R.M., fracturing her arm because she was crying. The father continued to get frustrated during visitation with R.M. and L.M. when he attempted to care for the children. Clear and convincing evidence showed that placing L.M. in a home with the parents would create a risk of danger to L.M. The mother had a history of staying in relationships with men who engaged in domestic violence. The mother insisted on staying with the father, and they had another child together while this case was pending. Testimony showed that the parents were not capable of parenting multiple children. At the time of the termination hearing, L.M. was thriving in the care of his foster parents, and all of his needs were being met. Furthermore, the permanency case manager testified that it would be in the children's best interest to terminate the parental rights of the mother and the father.

The trial court, as the trier of fact, is the sole judge of the witnesses' credibility. *A.B.*, 437 S.W.3d at 503. In light of the deference to be given the trial court in this regard, the evidence presented at trial, and the *Holley* factors, we conclude that the

9

trial court could reasonably have formed a firm belief or conviction that termination of both the mother's and the father's parental rights would be in L.M.'s best interest. *See Holley*, 544 S.W.2d at 371–72. Upon considering the record as it relates to the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of those involved, the plans for the child by the Department, the intellectual disabilities of the mother and the father, and the injury suffered by R.M. while in the care of the mother and the father, we hold that the evidence is legally and factually sufficient to support both (1) the trial court's finding that termination of the mother's parental rights is in the best interest of L.M. and (2) the trial court's finding that termination of the father's parental rights is in the best interest of L.M. *See id.* We defer to the trial court's findings as to the child's best interest, *see C.H.*, 89 S.W.3d at 27, and we cannot hold in this case that the trial court's findings as to best interest are not supported by clear and convincing evidence. Accordingly, we overrule the mother's third issue and the father's fourth issue.

*This Court's Ruling*

We affirm the trial court's order of termination.


JOHN M. BAILEY
CHIEF JUSTICE


September 22, 2022

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.